**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1993-18T1

W.D. and J.D., on behalf
of minor child G.D.,

     Petitioners-Appellants,

v.

BOARD OF EDUCATION OF
THE TOWNSHIP OF JEFFERSON,
MORRIS COUNTY,

     Respondents-Respondents.

_____

Argued telephonically September 14, 2020 –
Decided September 29, 2020

Before Judges Messano, Hoffman and Smith.

On appeal from the New Jersey Commissioner of
Education, Docket No. 160-7/17.

Flavio L. Komuves argued the cause for appellants
(Weissman & Mintz LLC, attorneys; Flavio L.
Komuves, Steven P. Weissman, Penelope A. Scudder
and Patricia Villaneuva, on the briefs).

Elizabeth Farley Murphy argued the cause for
respondent Board of Education of the Township of

Jefferson, Morris County (The Busch Law Group LLC, attorneys; Elizabeth Farley Murphy, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Commissioner of Education (Sookie Bae, Assistant Attorney General, of counsel; Aimee Blenner, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

During the 2016-17 school year, G.D. was a fifth-grade student of color at Arthur Stanlick Elementary School (the School) in Jefferson Township. Petitioners W.D. and J.D. (G.D.'s Mother),[1] the parents of G.D., requested a hearing before the Jefferson Township Board of Education (the Board), alleging G.D. was the victim of harassment, intimidation, or bullying (HIB) under the New Jersey Anti-Bullying Bill of Rights Act (Act), N.J.S.A. 18A:37-13 to -21. At the conclusion of a hearing held on April 10, 2017, the Board determined the complained-of conduct did not constitute HIB under the Act.

Petitioners now appeal from the final agency decision of the Commissioner of Education (the Commissioner), adopting the initial decision of

---

[1] J.D., G.D.'s mother, shares the same initials as J.D., the primary student involved in the HIB investigation.

the Administrative Law Judge (ALJ), concluding that the Board's determination was not arbitrary, capricious, or unreasonable. We affirm.

I

Though not subject of this appeal, petitioners introduced the following incident as background information before the ALJ. In November 2016, G.D. was on the school bus when two students, including C., engaged in a shouting match. At one point, "[C.] just said a bunch of curse words and one of them was the N-word." G.D. testified that C. looked at her when he said it. G.D. informed her mother of the incident, who sent an email to the school principal, Kevin Lipton, advising him of the incident. Lipton investigated the incident but did not open an HIB investigation.

The incident in question occurred on Friday, January 27, 2017, when G.D. and four female classmates, including J.D., were texting in an iMessage "group chat." The students were not in school at the time. Some of the students were persons of color; however, J.D. is white. In the chat, J.D. and B.A. pretended to fight about homework, calling each other "'B****,['] 'cunt,' [and] 'hoe.'" When G.D. and the other girls told them to stop fighting, "[J.D. and B.A.] said 'we pranked you!!!'" The girls, including G.D., then encouraged one another to continue the name-calling and continued using inappropriate language at and about each other. G.D. and P.R. also pretend-fought about homework. Then, J.D. said to G.D., "Fuck

ur dad you little niger [sic]."  G.D. replied, "that's racist[,]" and the conversation ended.

Shortly after the incident, B.A. reported she talked to G.D. over FaceTime; G.D. cried and said, "something about [J.D.] being white."  G.D. testified she did not expect J.D. to use the N-word and generally regarded her as "a good person."  The statement G.D. later provided read, "This whole fight made me feel angry that someone I was friends with is actually really mean.  I didn't want to go to school because I don't want to deal with her."  G.D. also testified she was concerned the situation at school would be "awkward" because her and J.D.'s seats would be moved and she would be taken out of class to be interviewed.

On Saturday, January 28, 2017, G.D.'s Mother sent an email with the subject line "Hib" to Principal Lipton; Dr. Patrick Tierney, the school superintendent; and Lisa Young, G.D.'s teacher.  The email stated:

> Minutes ago G[.D.] shared this screen shot of a message that she got from J[.D.] yesterday.  I want the girl moved out of her class.  My daughter should not have to sit in a classroom with someone who would say such disgusting things to her.  I am furious.  Especially as this is the 2nd time this school year that my precious daughter has been called this disgusting word!  I am outraged.  I don't even know what to do right now.  I'm contemplating whether I should even send her to school on Monday or not.

Lipton replied:

A-1993-18T1

Thank you for e-mailing this as soon as you found out. This kind of behavior is very disturbing. Ms. LaConti and I will start looking into this first thing Monday morning. I am hoping that you can assist us in this by doing two things. First, please send G[.D.] to school so that her educational needs can continue to be met, so that she may help Ms. LaConti and I in our investigation of this, and importantly to demonstrate that other people's behaviors will not sway G[.D.] or anyone else in our school from doing what we need to do. Second, can you please print out the entire thread from the message board and send it in. This will also help us in figuring out why it's happening, who exactly is responsible (one person or more than one), has it happened previously, is it happening to anyone else?

G.D.'s Mother agreed to send G.D. to school the following Monday but sent additional emails to Lipton that she was considering keeping G.D. out of school, demanding the school remove J.D. from G.D.'s classroom, and stating G.D. was "very uncomfortable about the entire situation." On January 30, 2017, Lipton notified the parents of G.D. and J.D. that the school commenced an HIB investigation.

On Monday, January 30, 2017, Lyndsay LaConti, the school's anti-bullying specialist, investigated the incident. LaConti conducted approximately sixty previous HIB investigations. She met with G.D. and her grandmother, interviewed the students involved, and obtained statements from five students, including G.D. LaConti also spoke with Ms. Young, who advised that G.D. seemed to be her happy,

A-1993-18T1

normal self in class on the Monday after the incident.  Ms. Young later testified the incident and subsequent events did not adversely affect G.D.'s attendance or grades.

The same day, LaConti completed a HIB Incident Report Form.  The report indicated J.D. "engaged in behavior that may be considered inappropriate, rude, disrespectful, or unkind, but the behavior does not violate school HIB guidelines." Specifically, the report found the incident:

- was reasonably perceived as being motivated either by any actual or perceived characteristic, such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or a mental, physical, or sensory disability or by any other distinguishing characteristic.

- took place off school grounds.

- a reasonable person should know, under the circumstances, will have the effect of physically or emotionally harming student or damaging the student's property, or placing a student in a reasonable fear of physical or emotional harm to his person or damage to his property or has the effect of insulting or demeaning any student or group of students

But the report did not find the incident:

- substantially disrupted or interfered with the orderly operation of the school or the rights of other students.

- created a hostile educational environment for the students by interfering with a student's education or by severely or pervasively causing physical or emotional harm to the student

6

Based on the above findings, LaConti concluded the incident was not HIB. She instead described the incident as a conflict among students.

On February 1, 2017, Lipton notified the parents of G.D. and J.D. of the results of the HIB investigation. A letter to G.D.'s parents stated, "The district did not find evidence your child was the target of the investigated act of [HIB]." A letter to J.D.'s parents stated that J.D. did not commit HIB "due to her actions taking place outside of school and, to this point, [] having no substantial impact on the operations of the school." Lipton also met with G.D.'s mother to explain how the school reached its conclusion. He explained:

> that because it was a conflict, because the girls all engaged in [texting together] . . . that G.D. was using very poor language, very insulting language herself, dropping F-bombs, dropping the C-bomb as well as the other girls– multiple girls were doing that this was stemming–that J.D.'s very, very horrible comment was stemming from that conflict.

After the investigation, G.D. and J.D. remained in the same classroom. G.D.'s mother reported a lunchroom incident where the two girls fought over their friends. She emailed Lipton, stating:

> Apparently, J[.D.] is not remorseful for her actions whatsoever. G[.D.] told me today that she was talking to a friend and J[.D.] came and pulled the friend by the arm away from her. Another friend also told G[.D.] that J[.D.] 'yelled' at her for defending G[.D.] This all happened in

7

school today so I'd say it is affecting my daughter's schooling and has crossed over to warrant an enforceable HIB. Again, I am requesting this child be removed from my daughter's classroom.

Sometime later, G.D. reached out to J.D. on Roblox, an online gaming platform, and told J.D. she was going to un-friend and block her on the platform. Ms. Young reported that she spoke to G.D. on two separate occasions "about her being mean to J.D." By late February, however, G.D., J.D., and the other students involved in the incident wanted to work on group projects together.

Petitioners appealed the School's HIB determination to the Board. On April 17, 2017, the Board denied the request to overturn the decision, noting the incident took place off school grounds and did not substantially interfere with the orderly operation of the school.

On July 26, 2017, petitioners appealed the Board's decision. The parties appeared before an ALJ for a hearing on the matter on January 6, 2018. On July 13, 2018, the ALJ filed his initial decision sustaining the Board's decision.

The ALJ found the "testimony of [G.D.'s Mother] somewhat different from what the evidence and testimony shows[,]" referring to her statements contending G.D.'s grades suffered, she did not want to return to school because of the incident, and she was adversely affected by it. Therefore, he afforded "the testimony of

[LaConti, Lipton, and Young] considerably more weight than the testimony of [G.D.'s Mother]."

The ALJ concluded the Board did not err in determining the incident was a conflict, rather than an HIB:

> The use of the [n-word] is abhorrent and cannot be tolerated. However, the facts under which the word was used clearly show that the five students involved in the chat room were doing so voluntarily. All were engaged in the use of extraordinarily offensive language towards each other, using words such as "cunt," "bitch," and "whore." They further offended the sensibilities of anyone who may read their remarks by making sexual references towards each other. In short, all five girls were engaged in mutually egregious behavior aimed at the others.

He also found G.D. "appeared to suffer no detrimental effect," noting her grades "were virtually unaffected" and that she appeared "nonplussed by the incident."

On August 23, 2018, petitioners filed exceptions to the ALJ's initial decision with the Commissioner, maintaining the use of the N-word constitutes HIB per se and a violation of G.D.'s rights. On November 29, 2018, the Commissioner filed his decision, upholding the ALJ's determination. The Commissioner agreed "for the reasons thoroughly set forth in the Initial Decision[,]" finding J.D. did not substantially violate G.D.'s rights under the Act. This appeal followed.

9

Our review of an administrative agency's final decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). To reverse an agency's decision, we must find that the agency's decision was "arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole." Ibid. (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). Accordingly, this court's review is guided by three major inquiries: "(1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion." Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283-84 (App. Div. 2013) (citing In re Stallworth, 208 N.J. at 194).

An appellate court, however, is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." In re Taylor, 158 N.J. 644, 658 (1999) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). Yet, this court "should give considerable weight to a state agency's interpretation of a statutory scheme that the legislature has entrusted to the agency to administer." In re Election Law Enf't Comm'n Op. No. 01-2008, 201 N.J. 254, 262 (2010). Even if a court may have reached a different result had it been the initial

decision maker, it may not simply "substitute its own judgment for the agency's." In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

"The Commissioner of Education is granted authority to implement [the Act]." L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 381 N.J. Super. 465, 498 (App. Div. 2005), aff'd as modified and remanded, 189 N.J. 381 (2007). The stated purpose of the Act is to promote "a safe and civil environment in school" by preventing "conduct that disrupts both a student's ability to learn and a school's ability to educate its students in a safe environment[.]" N.J.S.A. 18A:37-13. The Act was promulgated "to strengthen the standards and procedures for preventing, reporting, investigating, and responding to incidents of [HIB] of students that occur in school and off school premises[.]" N.J.S.A. 18A:37-13.1(f).

The Act defines HIB as:

> any gesture, any written, verbal or physical act, or any electronic communication, whether it be a single incident or a series of incidents, that is reasonably perceived as being motivated either by any actual or perceived characteristic, such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or a mental, physical or sensory disability, or by any other distinguishing characteristic, that takes place on school property, at any school-sponsored function, on a school bus, or off school grounds as

11

provided for in [N.J.S.A. 18A:37-15.3], that substantially disrupts or interferes with the orderly operation of the school or the rights of other students and that:

a. a reasonable person should know, under the circumstances, will have the effect of physically or emotionally harming a student or damaging the student's property, or placing a student in reasonable fear of physical or emotional harm to his person or damage to his property;

b. has the effect of insulting or demeaning any student or group of students; or

c. creates a hostile educational environment for the student by interfering with a student's education or by severely or pervasively causing physical or emotional harm to the student.

[N.J.S.A. 18A:37-14.]

In September 2012, the New Jersey Department of Education (NJDOE) issued a fifty-five-page publication, Guidance for Parents on the Anti-Bullying Bill of Rights Act (HIB Guide). It defined "conflict" as a "disagreement, argument, fight or other action between people when they want different things and everyone is equally involved. Conflict may look similar to bullying, but is different." Id. at 11.

The HIB Guide also detailed the differences between conflicts and bullying:

During a conflict, name-calling, threats and other conduct that might look like bullying can occur. However, a conflict and bullying are very different. Unlike bullying, during a conflict people are equally involved in some type

12

of disagreement. Conflict is considered mutual, meaning everyone is more or less evenly involved.

Bullying, on the other hand, involves one or several people (the bullies) the intentionally committing a mean or violent act against another person(s) or group of people (the victims). When bullying occurs, there is no mutual participation in a disagreement; it is one-sided. Bullying victims have a hard time defending themselves. The victims want the bullying to stop, but the bully continues the behavior.

Conflicts and bullying can interrupt the school day, damage property and cause injuries to the people involved. However, when the behavior involves a conflict, the school will take action based on its code of student conduct instead of [the Act].

[Ibid.]

## III

On appeal, petitioners argue the Commissioner erred in determining J.D.'s single use of the N-word toward G.D. was not HIB per se. They maintain the incident substantially interfered with G.D.'s rights in violation of the Act and should be viewed separate from the conflict between the students. Petitioners also contend the Commissioner and ALJ owed no deference to the Board's determination because it was arbitrary and capricious.

This court does not take lightly J.D.'s use of the N-word toward G.D., especially considering the greater historical context of white people using the N-

word against black people for the purpose of classifying and stigmatizing black people as inferior to whites. In light of this greater historical context, its usage in this case is most concerning where the target is a ten-year-old child. Even so, a full review of the record supports the Commissioner's conclusion – the incident in question was a conflict among a group of fifth-grade students using vulgar language and pretending to fight, rather than an act of HIB. All the students, including G.D., appear to have been fully involved in the pretend prank fight, notwithstanding J.D.'s inexcusable use of the N-word. After J.D. called G.D. the N-word, the conversation ended, as did the conflict.

Furthermore, the record does not establish G.D. suffered any significant impact beyond being rightfully upset following the incident and wanting to avoid resulting awkwardness at school the next day. Nor is there evidence the incident interfered with G.D.'s ability to safely and effectively learn. Petitioners are therefore unable to demonstrate the incident substantially disrupted or interfered with the orderly operation of the school or the rights of G.D.

If we were to adopt petitioner's position, that the single use of a racial slur is a per se violation of the Act, this court would effectively legislate, and give new meaning to the plain language of the Act. We are guided not to assume that role. See Watt v. Mayor and Council of Franklin, 21 N.J. 274, 277 (1956). Instead, our

review is limited to determining whether the Commissioner's decision was arbitrary, capricious or unreasonable, or unsupported by substantial credible evidence in the record.

Here, we conclude the record contains sufficient credible evidence supporting the Commissioner's decision, which was not arbitrary, capricious or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1993-18T1